# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Case No. 16-587C
Judge Wolski

FIRST PRIORITY LIFE INSURANCE COMPANY, INC., HIGHMARK INC., F/K/A HIGHMARK HEALTH SERVICES, HM HEALTH INSURANCE COMPANY D/B/A HIGHMARK HEALTH INSURANCE COMPANY, HIGHMARK BCBSD INC., HIGHMARK WEST VIRGINIA INC., HIGHMARK SELECT RESOURCES INC.

                             *Plaintiffs,*

v.

THE UNITED STATES OF AMERICA,

                             *Defendant.*

## BRIEF OF *AMICUS CURIAE* PENNSYLVANIA INSURANCE DEPARTMENT IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS

SEAN M. CONCANNON
Deputy General Counsel
Attorney ID 205998
Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
Tel: (717) 783-6563
sconcannon@pa.gov

AMY G. DAUBERT
Chief Counsel
Attorney ID 62064
Office of Chief Counsel for Insurance
1341 Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-2567
adaubert@pa.gov

**Dated: October 14, 2016**       *Attorneys for the Pennsylvania Insurance Department*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF INTEREST OF AMICUS CURIAE ..................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 2

ARGUMENT ....................................................................................................................... 3

    I.    Congress Included the Risk Corridors Provision in the Affordable Care Act to Promote Stability in the Exchange Marketplace ........................................... 3

        A.  Overview of the Affordable Care Act Design .................................... 3

        B.  The Risk Corridors Provision ............................................................. 4

    II.   The Department's Regulatory Functions Relative to the Health Insurance Market ........................................................................................... 6

        A.  Pennsylvania Insurance Department Regulatory Oversight .............. 6

        B.  The ACA Overlay on the Department's Traditional Regulatory Functions ........................................................................... 8

    III.  Risk Corridors Implicate Various Aspects of the Pennsylvania Health Insurance Industry and Impact Consumers ......................................................... 9

        A.  Risk Corridors Payments Affect Competition .................................... 9

        B.  Risk Corridors Payments Impact Insurer Solvency .......................... 12

        C.  Risk Corridors Receipts Help Stabilize the Market .......................... 13

CONCLUSION ................................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Blue Cross and Blue Shield of N.C.*, No. 1:16-cv-00651 (Fed. Ct. Cl. filed Jun. 2, 2016)..............9

*Health Republic Ins. Co. v. United States*,
    No. 1:16-cv-00259 (Fed. Ct. Cl. filed Feb. 24, 2016)............................................................9

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
    No. 1:16-cv-00744 (Fed. Ct. Cl. filed Jun. 23, 2016) ...........................................................9

*Maine Cmty. Health Options v. United States*,
    No. 1:16-cv-00967 (Fed. Ct. Cl. filed Aug. 9, 2016)............................................................9

*Moda Health Plan, Inc. v. United* States,
    No. 1:16-cv-00649 (Fed. Ct. Cl. filed Jun. 1, 2016) ..............................................................9

*Nat'l Fed'n of Indep. Bus. et al. v. Sebelius*, 132 S.Ct. 2566 (2012)................................................3

**STATUTES**

15 U.S.C. § 1011-1015 ...................................................................................................................3

26 U.S.C. § 5000A(a) .....................................................................................................................3

42 U.S.C. § 300gg...........................................................................................................................3

42 U.S.C. § 300gg-1 .......................................................................................................................3

42 U.S.C. § 300gg-3 .......................................................................................................................3

42 U.S.C. § 300gg-13 .....................................................................................................................4

42 U.S.C. § 18021 ...........................................................................................................................4

42 U.S.C. § 18022 ...........................................................................................................................4

42 U.S.C. §18031............................................................................................................................1

42 U.S.C. § 18061-18063 ...............................................................................................................4

Pub. L. No. 111-148........................................................................................................................1

Pub. L. No. 111-152........................................................................................................................1

**STATUTES (cont'd)**

**Page(s)**

40 P.S. § 3801.101 *et seq*......................................................................................................6

40 P.S. § 3801.304(b) ............................................................................................................7

**REGULATIONS**

45 C.F.R. § 153.530.................................................................................................................5

45 C.F.R. § 155.1000 *et seq*..................................................................................................5

**FEDERAL REGISTER**

80 Fed. Reg. 10,749 (Feb. 27, 2015) .....................................................................................5

**MISCELLANEOUS**

Aetna, *Aetna to Narrow Individual Public Exchange Participation,* Aug. 15, 2016,
  news.aetna.com/news-releases/aetna-to-narrow-individual-public-
  exchange-participation/..............................................................................................10

American Academy of Actuaries, *Fact Sheet: ACA Risk-Sharing Mechanisms,* 2013,
  www.actuary.org/files/ACA_Risk_Share_Fact_Sheet_FINAL120413.pdf ........................4

Center for Consumer Information and Insurance Oversight, *2015 Letter to Issuers
  in Federally-facilitated Marketplaces,* Mar. 14, 2014,
  www.cms.gov/CCIIO/Resources/Regulations-and-
  Guidance/Downloads/2015-final-issuer-letter-3-14-2014.pdf............................................5

Center for Consumer Information and Insurance Oversight, *Risk Corridors Proration Rate for
  2014,* Oct. 1, 2015, www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-
  Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf ......6

Center for Consumer Information and Insurance Oversight, *State Effective Rate Review
  Programs*, https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/
  rate_review_fact_sheet.html ..................................................................................1, 6

Centers for Medicare & Medicaid Services, *Health Insurance Marketplace Open
  Enrollment Snapshot - Week 13,* Feb. 4, 2016,
  www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-
  sheets-items/2016-02-04.html...............................................................................9

Galewitz, Phil. "*United Healthcare to Exit All But 'Handful' Of Obamacare
  Markets In 2017*, Kaiser Health News, Apr. 19, 2016,
  khn.org/news/unitedhealthcare-to-exit-all-but-handful-of-obamacare-
  markets-in-2017/ ...................................................................................................10

**MISCELLANEOUS (cont'd)**

**Page(s)**

HealthCare.gov, *Pennsylvania Rate Review Submissions, Highmark Health Services*,
 www.ratereview.healthcare.gov/ ........................................................................................7

Letter from Kevin J. Counihan, Director, Center for Consumer Information and
 Insurance Oversight, to State Insurance Department Commissioners (Jul. 20, 2015),
 https://www.cms.gov/cciio/resources/letters/downloads/
 doi-commissioner-letter-7-20-15.pdf ................................................................................5

Pennsylvania Insurance Department, *2017 ACA Rate Filings Hearing*,
 www.insurance.pa.gov/Pages/2017-Rate-Filing-Hearing.aspx .........................................12

Pennsylvania Insurance Department, *ACA Health Rate Filings,*
 www.insurance.pa.gov/Consumers/HealthInsuranceFilings/Pages/default.aspx ................7

The Henry J. Kaiser Family Foundation, *The Pennsylvania Health Care
 Landscape*, Apr. 25, 2016, kff.org/health-reform/fact-sheet/the-
 pennsylvania-health-care-landscape/ ..........................................................................11, 13

The Pennsylvania Insurance Department ("PID" or "the Department") respectfully submits this *amicus curiae* brief in opposition to the United States' Motion to Dismiss filed on September 16, 2016 in the above-captioned matter ("Motion to Dismiss").

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

The Insurance Department, led by Insurance Commissioner Teresa D. Miller (collectively, the Department), is charged with administering the laws regulating the business of insurance in the Commonwealth of Pennsylvania. As the primary regulator of commercial health insurance policies sold in the Commonwealth, the Department is tasked with protecting consumers by ensuring that the rates charged by certain insurance carriers are not excessive, inadequate, or unfairly discriminatory; protecting and promoting the solvency of its domestic insurance carriers so they may pay policyholders' claims as they are due; and providing stability in the marketplace. Additionally, the Department has exclusive jurisdiction over the review and approval of certain commercial health insurance rates[1], including those sold on the statewide health insurance marketplace established by the Affordable Care Act, known as the Exchange.[2]

Four of the Plaintiffs are Pennsylvania-domiciled insurance companies, each of whom currently offer products on Pennsylvania's Exchange; the Department is charged with oversight

---

[1] Pennsylvania is an effective rate review state. *See* Center for Consumer Information and Insurance Oversight (CCIIO), *State Effective Rate Review Programs*, https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ rate_review_fact_sheet.html (last visited Oct. 14, 2016).

[2] The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (codified in scattered sections of 42 U.S.C.), together with the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (codified as amended in scattered sections of 42 U.S.C.), are referred to herein as "Affordable Care Act" or the "ACA." The Exchanges–virtual marketplaces run by either the state or federal government that allow consumers to shop for individual health insurance policies directly – were created pursuant to section 1311 of the ACA, 42 U.S.C. § 18031 and are the only forums where federal subsidies are available. Plans were first offered on the Exchange in 2014.

1

over their health insurance rates and solvency.[3] These companies comprised a significant portion of the Exchange market in Pennsylvania in 2014, and with the exit of two national carriers from the Pennsylvania Exchange in recent months, maintaining the participation of remaining insurers on the Exchange is more important to ensure that consumers benefit from a competitive market.

Accordingly, the Department submits this brief as *amicus curiae* in support of Plaintiff's opposition to the United States' Motion to Dismiss because this case involves the administration of the Risk Corridors provision of the ACA, which directly implicates health insurance company solvency, market competition, and overall marketplace stability, and indirectly implicates health insurance premium rates, all of which are insurance issues that are important both to Pennsylvania consumers and the regulation of the health insurance industry as a whole. As such, the Department has a direct interest in the outcome of this case.

## SUMMARY OF ARGUMENT

The Pennsylvania Insurance Department, as a friend of the Court, offers its perspective as the primary regulator of health insurance companies in the Commonwealth, particularly as it administers and implements the Affordable Care Act in its market. First, the Department will briefly describe the primary elements of the ACA generally as well as the attributes of its Risk Corridors provision. Second, the Department will inform the Court of the impact the partial and delayed Risk Corridors payments have had on the Pennsylvania health insurance market in terms of: (1) competition, (2) solvency, and (3) market stability.

---

[3] The Pennsylvania-domiciled plaintiffs are First Priority Life Ins. Company, Inc., Highmark Inc., f/k/a Highmark Health Services, HM Health Insurance Company d/b/a Highmark Health Ins. Co., and Highmark Select Resources Inc. In 2014, Highmark Inc., Highmark Health Insurance Co., and First Priority Life Insurance Company, Inc. offered plans on the Exchange. In 2017, Highmark Inc. and Highmark Health Ins. Co. will offer on the Exchange.

## ARGUMENT

**I.  Congress Included the Risk Corridors Provision in the Affordable Care Act to Promote Stability in the Exchange Marketplace.**

**A. Overview of the Affordable Care Act Design.**

On March 23, 2010, President Barack Obama signed into law the health insurance reform package known as the Affordable Care Act. This new law represented a significant departure from the previous system of providing, purchasing and regulating health insurance.[4] Health insurance is now unique in the insurance industry in that both the federal and state governments regulate it simultaneously and cooperatively. While under the ACA, the federal government is responsible for the development of many health insurance-related regulations and rules, the implementation and enforcement of these mandates are often left to the states.

Under the ACA, for the first time beginning in 2014, all individuals were required to have health care coverage or pay a penalty unless they met certain exceptions. *See* ACA § 1501, 26 U.S.C. § 5000A(a) (2012); *Nat'l Fed'n of Indep. Bus. et al. v. Sebelius*, 132 S.Ct. 2566 (2012). At the same time, the ACA required that health insurers make their health insurance products available to all individuals, regardless of their health status. *See* ACA § 1201, 42 U.S.C. § 300gg-1. The combination of these requirements meant that individuals who previously were uninsured due to pre-existing health conditions[5], and who therefore came into the market with pent-up health care needs, were now required to be covered by any insurer to whom those

---

[4] While the business of insurance has traditionally been and continues to be primarily regulated by state governments, the ACA represents an expansion of federal authority by creating a robust federal regulatory regime with respect to health insurance. *See* McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (2012).

[5] Pre-existing health conditions functioned either as a basis for an insurer to decline to cover the individual, or for an insurer to price coverage at a prohibitively high rate, with the same result of no coverage. Under the ACA, coverage must be guaranteed available, and may not be medically underwritten except as permitted, within bounds, for age, geography, tobacco use, and family size. See ACA §1201, adding §§ 2702 and 2704 to the Public Health Service Act, codified at 42 U.S.C. §§ 300gg, 300gg-3.

individuals applied for coverage. This led to a more uniform distribution of the costs of health insurance across the population, but also largely eliminated health insurers' longstanding method of underwriting individuals according to their risk, requiring insurers to significantly change their method of calculating the premiums necessary to cover enrollee costs.

Moreover, the ACA requires insurers to cover preventive services without cost sharing paid by insureds, and, for individual and small group policies, requires health insurers to provide coverage for a comprehensive package of benefits known as Essential Health Benefits. *See* ACA § 1001, 42 U.S.C. § 300gg-13; ACA §§ 1301, 1302, 42 U.S.C. §§ 18021, 18022. Both of these provisions, coupled with tax credits and cost-sharing subsidies, led to more comprehensive and accessible care for consumers, but at higher costs for insurers.

### B. The Risk Corridors Provision.

Recognizing the financial risks for insurers in the early years of guaranteed availability of health insurance under the ACA, the ACA included certain risk-sharing provisions: a transitional reinsurance program, a temporary Risk Corridors provision, and a permanent risk adjustment provision. *See* ACA §§ 1341-43, 42 U.S.C. §§ 18061-63. These risk-sharing provisions were seen as mechanisms to incentivize participation in the Exchange in the face of the unpredictability brought about by the new pool of individuals purchasing insurance and the new requirements for the coverage required to be provided to them. *See* American Academy of Actuaries, *Fact Sheet: ACA Risk-Sharing Mechanisms* (2013), *available at* http://www.actuary .org/files/ACA_Risk_Share_Fact_Sheet_FINAL120413.pdf (last visited Oct. 7, 2016). The two temporary programs were set up to cover calendar years 2014 - 2016. ACA §§ 1341, 1342.

At issue in this case is the Risk Corridors provision, which was designed to ensure that carriers neither earned nor lost too much in the early years of the Exchange's operation – when the health needs of the newly insured population were still largely unknown. *See* American

4

Academy of Actuaries, *supra.* Stated simply, the Risk Corridors provision requires carriers selling on the Exchange that accrued profits in excess of a benchmark amount to remit a portion of those profits to the federal government and conversely obligates the federal government to pay a portion of the losses incurred above a benchmark amount to carriers selling on the Exchange.

In 2013, insurers signed QHP Agreements in order to participate in the Exchange for 2014 under the assumption that Risk Corridors payments would be paid fully and timely by CMS as set forth in the regulations. Similarly, an insurer offering plans on the Exchange in 2014 had to decide whether to continue to participate on the Exchange in 2015 well before it had complete information regarding Risk Corridors payments for 2014. *See* 45 C.F.R. §§ 153.530, 155 Subpart K; CCIIO, *2015 Letter to Issuers in Federally-facilitated Marketplaces, at 8, 27* (Mar. 14, 2014) *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and Guidance/ Downloads/2015-final-issuer-letter-3-14-2014.pdf (last visited Oct. 6, 2016) (requiring insurers to sign a QHP Agreement in September committing to offer plans on the Exchange in the upcoming plan year). Once that QHP Agreement was signed, an insurer could not withdraw any of its plans from the Exchange and had to accept for coverage all eligible applicants.

To account for the financial risk associated with providing the coverage to which it had committed, insurers sought approval of rates that accounted for the risk to the extent it could be actuarially predicted. Insurers that chose to sign QHP Agreements did so with the assumption that, should those rates be unexpectedly inadequate, insurers' financial liability would be offset by full payments made under the Risk Corridors provision.[6] Only in October 2015, after insurers

---

[6] That assumption was not unreasonable given the continued representations made by the Centers for Medicare and Medicaid Services (CMS) as late as July 21, 2015 indicating that full payment would be made. *See, e.g.,* Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10749, 10779; Letter from Kevin J. Counihan, Director, Center for Consumer Information and Insurance Oversight, to State Insurance Department Commissioners (Jul. 20, 2015), https://www.cms.gov/cciio/resources/letters/downloads/doi-commissioner-letter-7-20-15.pdf (last visited Oct. 14, 2016).

5

had signed their 2016 QHP Agreements and finalized their products and rates for 2016, did it become apparent that full payment for Plan Year 2014 Risk Corridors would not be made in 2015. *See* CCIIO, *Risk Corridors Proration Rate for 2014* (Oct. 1, 2015) *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-StabilizationPrograms/ Downloads/RiskCorridorsPaymentProrationRate for2014.pdf (last visited Oct. 6, 2016). By then, issuers had already committed to selling their products on the Exchange for Plan Year 2016, effectively locking them in to participation for the entire three years contemplated in the ACA for the Risk Corridors provision without any assurance of how much money they would ultimately receive.

## II. The Department's Regulatory Functions Relative to the Health Insurance Market.

### A. Pennsylvania Insurance Department Regulatory Oversight.

The Pennsylvania Insurance Department was first established in 1873. The Department is responsible for monitoring the financial solvency of insurance companies, licensing insurance companies and producers, reviewing and approving certain insurance policy language and rates, and coordinating the rehabilitation and liquidation of insolvent insurance companies. The Department's mission is to provide a premier regulatory environment that promotes a competitive marketplace and serves the best interests of Pennsylvania consumers. Most relevant to this case are the Department's charges of reviewing rates, monitoring companies' financial solvency, and protecting consumers.

The Department is responsible for reviewing and approving rates for health insurance policies available for purchase through the Exchange. This authority was made clear with the passage of Act 134 of 2011, known as the Accident and Health Filing Reform Act; the federal Department of Health and Human Services (HHS) recognized Act 134 as giving Pennsylvania authority as an Effective Rate Review state. *See* 40 P.S. §§ 3801.101 *et seq.*; *State Effective Rate*

*Review Programs*, *supra*, note 1.[7] Pursuant to state law, any proposed rate may not be approved if it is inadequate, excessive, or unfairly discriminatory. 40 P.S. § 3801.304(b). Rates must be sufficient to cover projected claims and administrative expenses but cannot be so high as to be unnecessary. In reviewing a rate filing, the Department analyzes whether the proposed rate is actuarially justified.[8] The provisions of the ACA added layers to this analysis by imposing requirements relative to actuarial justification over and above what state law otherwise requires. Despite this regulatory review, as costs of medical care continue to rise and the ACA provisions requiring individuals to be covered and insurers to make products available to all eligible applicants were implemented, premiums have continued to increase.[9]

In addition to its rate review authority, the Department is also tasked with monitoring the financial solvency of insurance companies. Beginning with the process of licensing a company to do the business of insurance in the Commonwealth, and continuing through regular financial analysis and examinations, the Department oversees compliance by an insurer with comprehensive financial standards. The goal of this oversight is to assure the financial solvency of an insurer, using conservative statutory accounting principles that emphasize accounting for

---

[7] As an Effective Rate Review state, the Department has legal authority to analyze rate filings and the resources required to do so, as well as an adequate process to promote public participation in the rate review process.

[8] This requires evaluating factors such as: medical cost trend, utilization of services, changes in covered benefits, changes in enrollee risk profile, the medical loss ratio, administrative costs, financial reserving needs, and capital and surplus.

[9] In 2015, approved rate increases for insurers selling group or individual policies on the Pennsylvania Exchange ranged from -23.07% to 27.3%, and in 2016, the approved increases ranged from -9.21% to 35.01% over the previous year's rates. *See* HealthCare.gov, *Pennsylvania Rate Review Submissions*, *Highmark Health Services*, available at http://www.ratereview.healthcare.gov (last visited Oct. 11, 2016). While the final rates for 2017 have not yet been released and will be announced in the coming days, requested increases were largely in the range of 20-40%. *See* Pennsylvania Insurance Department, *ACA Health Rate Filings*, available at http://www.insurance.pa.gov/Consumers/HealthInsuranceFilings/Pages/default.aspx (last visited Oct. 7, 2016).

assets that can be used to pay claims rather than assets that are not liquid or are not likely to be received. If a particular asset is not likely to be received, like the payments under the Risk Corridor provision, it must be written off of the balance sheet. The Department is responsible for ensuring that these write-offs do not rise to the level of insolvency.

Consumers are served by the Department's commitment to fostering a stable, robust, and competitive health insurance market in the Commonwealth. The Department accomplishes this by approving competitive rates, ensuring that its insurers remain in a strong financial position so that the insurers can both offer product choices for consumers and pay claims when they are due, and working with carriers to ensure that they are complying with all state and federal mandates so that every health insurance policy sold in Pennsylvania contains all required benefits and consumer protections.

### B. The ACA Overlay on the Department's Traditional Regulatory Functions.

The Department has been responsible for the ACA's implementation at the state level, in connection with HHS.[10] The Department is cognizant of the impact the ACA has had on Pennsylvanians, as well as the insurers offering products to them, and has sought to implement the ACA's provisions in a reasonable and prudent manner. The Department cooperates closely with the federal government and other state insurance departments to stay abreast of the most current and vital issues surrounding ACA implementation, and also solicits input from those stakeholders who know most personally the effects of the ACA: consumers.

For example, the Department invites public comments on all of its health insurance rate filings. In July 2016, the Department held a public informational hearing at which consumers were able to testify regarding the impact rate increases could have on their personal financial situations. These communications have provided invaluable insight to the Department and make

---

[10] CMS and CCIIO are components of HHS, representing portions of a single federal agency.

it uniquely qualified to comment on the manner in which incomplete or untimely Risk Corridors payments impact the Pennsylvania health insurance market and its consumers.

Pennsylvania is the sixth most populous state in the nation, with over 12.6 million residents. Of these residents, as of early 2016, over 565,000 individuals purchased fully ACA-compliant health insurance in the individual market, 439,000 of whom selected their health insurance on the Exchange. *See* CMS, *Health Insurance Marketplace Open Enrollment Snapshot - Week 13* (Feb. 4, 2016) *available at* https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-02-04.html (last visited Oct. 7, 2016). The Pennsylvania Plaintiffs are providing coverage to about 22% of enrollees in the individual market. The Plaintiffs thus form an important part of the Pennsylvania health insurance landscape, and in turn, that of the nation.[11] The resolution of the issues raised in Plaintiffs' Complaint will likely influence the condition of both the Exchange and the broader health insurance market.

### III. Risk Corridors Implicate Various Aspects of the Pennsylvania Health Insurance Industry and Impact Consumers.

#### A. Risk Corridors Payments Affect Competition.

Pennsylvania is fortunate in that in 2017, residents of most counties will still have their choice between carriers offering plans on the Exchange, but it is, like every state, still susceptible to the threat of product and carrier withdrawals that diminish consumer choice and otherwise impair the vibrancy of the market. For example, for the first time since the Affordable Care Act

---

[11] The Plaintiffs' complaints against the federal government are not isolated or idiosyncratic; they are shared by other carriers in the Pennsylvania market and across the nation. *See Health Republic Ins. Co. v. United* States, No. 1:16-cv-00259 (Fed. Ct. Cl. filed Feb. 24, 2016); *Moda Health Plan, Inc. v. United* States, No. 1:16-cv-00649 (Fed. Ct. Cl. filed Jun. 1, 2016); *Blue Cross and Blue Shield of N.C.*, No. 1:16-cv-00651 (Fed. Ct. Cl. filed Jun. 2, 2016); *Land of Lincoln Mut. Health Ins. Co. v. United States*, No. 1:16-cv-00744 (Fed. Ct. Cl. filed Jun. 23, 2016); *Maine Cmty. Health Options v. United States*, No. 1:16-cv-00967 (Fed. Ct. Cl. filed Aug. 9, 2016).

took effect, this year in some counties only one carrier's plans will be sold.[12] Without full and timely receipt of Risk Corridors payments, additional carriers may withdraw from the Exchange due to unanticipated losses. If more carriers leave the market, Pennsylvania could be faced with the possibility of having counties where no insurers offer coverage on the Exchange. Because the federal tax subsidies are only available for plans sold on the Exchange, this would be a catastrophic outcome for many lower income Pennsylvanians who rely on the Exchange and its subsidies to provide coverage they can afford.

Competition serves Pennsylvania consumers by incentivizing lower premiums, innovation in plan design, and high quality customer service. Without competitive market forces, these incentives are lacking. The Department is able to ensure that rates are actuarially sound and that plans include mandatory benefits, but market competition can apply pressure that the Department cannot. Without this pressure, insurers may choose to eliminate certain plan offerings or attributes that consumers have enjoyed in the past.

The Affordable Care Act intended the health insurance Exchanges to be about choice and to provide consumers with a marketplace where they could compare options and choose a plan that best meets their needs. The Department encourages consumers to look at a number of factors when they make this choice; not only the premium of a plan, but also other aspects of benefit design like the deductible, the providers available in the network, and the drugs available through the formulary. Different insurance companies often specialize in certain types of plans that differ in some of these key aspects of a benefit design. For example, some insurance companies may be

---

[12] This is a result of the withdrawal from the Exchange of two large national insurers that cited the losses sustained in its early years as the impetus for their exits, as well as the Plaintiffs' decisions over the last several years to reduce their service areas. *See* Phil Galewitz, *United Healthcare to Exit All But 'Handful' Of Obamacare Markets In 2017*, Kaiser Health News, Apr. 19, 2016, *available at* http://khn.org/news/unitedhealthcare-to-exit-all-but-handful-of-obamacare-markets-in-2017/ (last visited Oct. 7, 2016); *Aetna to Narrow Individual Public Exchange Participation*, Aug. 15, 2016, https://news.aetna.com/news-releases/aetna-to-narrow-individual-public-exchange-participation/ (last visited Oct. 7, 2016).

affiliated with provider systems and specialize in efficient narrow network plans that can contain costs and provide greater coordination of care, while others may tout their broad networks where consumers have a number of providers from which to choose. Further, insurers are often incentivized to offer new and different plan designs when their competitors do the same, leading to even more choices for consumers. These are choices the Affordable Care Act intended consumers to have, to their benefit. But as carriers leave the market, these choices are depleted and consumers are left with the remaining plans, regardless of whether they meet their coverage needs.

Decreased competition also has an effect on rates. While rate increases are largely constrained by regulatory limitations, market competition can serve as a powerful check on rate increases by encouraging insurers to do more with less, such as exploring innovative ways to curb medical losses or to cut administrative expenses. Absent this pressure from competitors, an insurer operating in a non-competitive service area has little incentive to control costs that will ultimately moderate the cost of health insurance for consumers. Competition therefore serves as an important complement to regulatory oversight in ensuring rate increases are not excessive.

Even with competition and regulatory oversight, the burden of paying health insurance premiums is significant for many Pennsylvania consumers. In a March 2016 survey, over half of all Pennsylvanians surveyed reported that it was difficult for them to afford healthcare. *See* The Henry J. Kaiser Family Foundation, *The Pennsylvania Health Care Landscape*, Apr. 25, 2016, *available at* http://kff.org/health-reform/fact-sheet/the-pennsylvania-health-care-landscape /#footnote-186841-22 (last visited Oct. 7, 2016). This point was articulated emphatically at the Department's July 2016 public hearing on proposed rate increases. There, consumers testified that they were having great difficulty absorbing the cost of increased health insurance premiums and cost-sharing, and many indicated that they were compelled to forego medical treatment due

to the associated costs.  *See* Pennsylvania Insurance Department, *2017 ACA Rate Filings Hearing*, http://www.insurance.pa.gov/Pages/2017-Rate-Filing-Hearing.aspx (last visited Oct. 10, 2016). The credible promise of complete Risk Corridors payments can encourage participation in the individual market, leading to increased competition and all of its attendant benefits.

### B. Risk Corridors Payments Impact Insurer Solvency.

Since 2015, the national health insurance market has watched as many health insurers either became insolvent or exited the Exchange as a result of large losses in the ACA market. Pennsylvania is fortunate that, unlike in some other states, none of the insurers offering insurance on its Exchange have had to close their doors as a result of losses sustained due to the ACA. Pennsylvania looks at the events in other states as cautionary tales it wishes to avoid.  Doing so requires careful monitoring of the assets and receivables of its insurers.

Health insurers, like all insurance companies, are required to meet minimum standards with respect to risk-based capital, or RBC.  The formula to calculate a health insurance company's RBC ratio is complex, but it accounts for a category of risk known as underwriting risk. Underwriting risk, also known as pricing or premium risk, reflects the potential impact that incorrect pricing may have on a company's financial position.  The Risk Corridors provision was designed to help insurers mitigate this type of risk by creating a mechanism whereby companies that priced their products with an expectation as to the health of its many new enrollees, but found that those enrollees were much less healthy, and therefore much more expensive to cover, could recover some of the associated losses from that unforeseen risk.  Insurers that believed they would have a safety net in the event of improper pricing instead had to absorb unexpected losses, deleteriously affecting their RBC ratios.  Even companies that have high RBC ratios are

threatened by incomplete collections of receivables. Any impairment of capital depletes an insurer's reserves and renders fewer dollars than expected available to pay claims.

### C. Risk Corridors Receipts Help Stabilize the Market.

Risk Corridors were designed to spread the risk of entering a new market among all market participants. Incomplete payments prevent the market from stabilizing as originally contemplated. With losses causing insurers to exit the market or modify their product offerings, as explained above, consumers have had little in the way of predictability or continuity in the first three years of the Exchange's operation. Many Pennsylvanians have had to select a new plan each year because the plan they chose the year before was discontinued. *See* Kaiser Family Foundation, *supra.* This is problematic for consumers and for insurers.

For insurers, modification of product offerings leads consumers to change plans or carriers, forcing insurers to begin anew without adequate data to predict the costs of insuring those consumers. It requires insurers to make additional actuarial assumptions that may ultimately prove to be incorrect, leading to additional fluctuations in future premium pricing. Moreover, changing carriers may also require consumers to adjust to new cost sharing structures or even different provider networks. These types of disruptions do not allow for efficient utilization of health insurance benefits and can ultimately be costly for consumers who do not understand their plan's features.

The Department endeavors to stabilize its health insurance market by reining in premium volatility through its rate review process. Because of the number of factors that must be considered in developing rates, as well as the rapid accumulation of new ACA data that insurers have had to interpret and apply, insurance rates have varied greatly from year to year. After CMS announced in 2015 that insurers would be paid 12.6% of the Risk Corridors payments due them for 2014, several Pennsylvania carriers filed requested increases in excess of 40% over last

year's rates. In order for insurance companies to price products appropriately, and for consumers to use their health insurance benefits most effectively, a stable market is needed.

## CONCLUSION

For the reasons set forth above, the Department respectfully suggests that this Court consider this regulatory perspective on the impact of the failure to make full Risk Corridor payments as contemplated by section 1342 of the ACA, in its analysis. The impact on the health insurance market in terms of competition, insurer solvency and market stability, as discussed above, should be weighed by this Court as it considers the positions of the parties and the merits of Highmark's complaint.

Respectfully submitted,

By: **/s/ Sean M. Concannon**
SEAN M. CONCANNON
Deputy General Counsel
Attorney ID 205998
Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
Telephone: 717-783-6563
sconcannon@pa.gov

AMY G. DAUBERT
Chief Counsel
Attorney ID 62064
Office of Chief Counsel for Insurance
1341 Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-2567
adaubert@pa.gov

*Attorneys for the Pennsylvania Insurance Department*

Dated: October 14, 2016

# CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2016, a copy of the foregoing, the **Brief of Amicus Curiae Pennsylvania Insurance Department in Opposition to the United States' Motion to Dismiss**, was filed electronically with the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing will be sent to all parties by operation of the Court's ECF system.

Lawrence S. Sher
Reed Smith LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, DC 20005-3317
(202) 414-9209
Fax: (202) 414-9299
Email: lsher@reedsmith.com
*Counsel for Plaintiffs*

Charles Edward Canter
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-2236
Fax: (202) 307-0494
Email: charles.canter@usdoj.gov
*Counsel for Defendants*

**/s/ Sean M. Concannon**
SEAN M. CONCANNON
Deputy General Counsel
Attorney ID 205998