## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRST PRIORITY LIFE INSURANCE | : | |
| COMPANY, INC., HIGHMARK INC. F/K/A | : | Judge Wolski |
| HIGHMARK HEALTH SERVICES, HM | : | |
| HEALTH INSURANCE COMPANY D/B/A | : | Case No. 16-587C |
| HIGHMARK HEALTH INSURANCE | : | |
| COMPANY, HIGHMARK BCBSD INC., | : | |
| HIGHMARK WEST VIRGINIA INC., AND | : | |
| HIGHMARK SELECT RESOURCES INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

---

### THE UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

CHARLES E. CANTER
FRANCES M. MCLAUGHLIN
SERENA M. ORLOFF
TERRANCE A. MEBANE
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.    The Court Lacks Jurisdiction and the Claims Are Not Ripe Because Full Payments
        Are Not Due Annually ................................................................................................ 2

        A.    A Presently Due Claim Is a Prerequisite of Tucker Act Jurisdiction ..................... 2

        B.    Final Risk Corridors Payments Are Not Presently Due ......................................... 4

            1.    HHS's Three-Year Framework Is Entitled to Deference ................................ 5

            2.    HHS's Three-Year Framework Is Reasonable and Therefore Payments
                Are Not Presently Due ................................................................................. 8

        C.    Highmark's Claims Also Are Not Ripe ............................................................... 10

        D.    Highmark's Claim for 2015 Is Improper .............................................................. 11

    II.    Highmark's Contracts and Takings Claims Must Be Dismissed for Failure to
        State a Claim on Which Relief Can Be Granted ...................................................... 12

        A.    Highmark Fails to State a Claim on Count II (Breach of Express Contract) ......... 12

            1.    The QHP Agreements Do Not Encompass Risk Corridors Obligations ......... 13

            2.    Even if the QHP Agreement Incorporated Risk Corridors Obligations,
                Highmark Has Not Identified a Breach or Damages ..................................... 17

        B.    Highmark Fails to State a Claim on Count III (Breach of Implied Contract) ....... 18

            1.    Highmark Has Failed to Allege Facts that Demonstrate an Intent to
                Contract ...................................................................................................... 18

            2.    HHS Lacked Authority to Bind the United States in Contract for the
                Payment of Risk Corridors Amounts .......................................................... 21

                 a.    The Complaint Fails to Plausibly Allege Contracting Authority ............ 21

                b.    The Complaint Fails to Plausibly Allege Budget Authority .................... 23

            3.    An Implied Contract Cannot Be Grounded on an Express Contract .............. 25

        C.    Highmark Fails to State a Claim on Count V (Takings) ........................................ 26

CONCLUSION ................................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AAA Pharmacy, Inc. v. United States,*
   108 Fed. Cl. 321 (2012) ......................................................................................... 21

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ............................................................................................... 10

*Adams v. United States,*
   391 F.3d 1212 (Fed Cir. 2004) .............................................................................. 26

*Am. Pelagic Fishing Co. v. United States,*
   379 F.3d 1363 (Fed. Cir. 2004) ....................................................................... 26, 27

*Annuity Transfers, Ltd. v. United States,*
   86 Fed. Cl. 173 (2009) ............................................................................................ 3

*ARRA Energy Co. I. v. United States,*
   97 Fed. Cl. 12 (2011) ............................................................................................ 19

*Avenal v. United States,*
   33 Fed. Cl. 778 (1995) .......................................................................................... 26

*Baker v. United States,*
   50 Fed. Cl. 483 (2001) .......................................................................................... 19

*Bank of Guam v. United States,*
   578 F.3d 1318 (Fed. Cir. 2009) ............................................................................ 13

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................................................. 22

*Bell/Heery v. United States,*
   106 Fed. Cl. 300 (2012) ........................................................................................ 14

*Bell/Heery v. United States,*
   739 F.3d 1324 (Fed. Cir. 2014) ............................................................................ 12

*Bowen v. Gilliard,*
   483 U.S. 587 (1987) .............................................................................................. 27

*Brooks v. Dunlop Mfg. Inc.,*
   702 F.3d 624 (Fed. Cir. 2012) ................................................................... 19, 20, 21

*Brooks v. Dunlop Mfg. Inc.,*
   No. C 10-04341 CRB, 2011 WL 6140912 (N.D. Cal. Dec. 9, 2011) ...................... 27

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
527 F.3d 1278 (Fed. Cir. 2008) ............................................................ 10

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) ............................................................. 3

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
400 F.3d 1352 (Fed. Cir. 2005) ............................................................. 5

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*,
8 F.Supp.3d 500 (S.D.N.Y. 2014) ......................................................... 6

*Cessna Aircraft Co. v. Dalton*,
126 F.3d 1442 (Fed. Cir. 1997) ..................................................... 23, 25

*Cherokee Nation of Oklahoma v. Leavitt*,
543 U.S. 631 (2005) ............................................................................ 23

*Doe v. United States*,
463 F.3d 1314 (Fed. Cir. 2006) ............................................................. 2

*Earman v. United States*,
114 Fed. Cl. 81 (2013) ........................................................................ 15

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ............................................................. 2

*Frazier v. United States*,
67 Fed. Cl. 56 (2005) .......................................................................... 13

*Frymire v. United States*,
51 Fed. Cl. 450 (2002) ........................................................................ 20

*Hercules Inc. v. United States*,
516 U.S 417 (1996) ............................................................................. 25

*Higashi v. United States*,
225 F.3d 1343 (Fed. Cir. 2000) ............................................................. 9

*HSH Nordbank AG v. United States*,
121 Fed. Cl. 332 (2015) ...................................................................... 26

*Johns-Manville Corp. v. United States*,
12 Cl. Ct. 1 (1987) ............................................................................. 25

*Johnson v. United States*,
105 Fed. Cl. 85 (2012) .......................................................................... 3

*Kanag'iq Constr. Co. v. United States*,
51 Fed. Cl. 38 (2001) .......................................................................... 20

*Kanemoto v. Reno*,
   41 F.3d 641 (Fed. Cir. 1994)..............................................................................3

*King v. Burwell*,
   135 S. Ct. 2480 (2015)......................................................................................7

*Lummi Tribe of Lummi Reservation v. United States*,
   99 Fed. Cl. 584 (2011).......................................................................................3

*Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*,
   763 F.2d 1441 (D.C. Cir. 1985).........................................................................4

*Massie v. United States*,
   226 F.3d 1318 (Fed. Cir. 2000)......................................................................2, 3

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*,
   169 F.3d 747 (Fed. Cir. 1999)...........................................................................14

*N.Y. Airways, Inc. v. United States*,
   369 F.2d 743 (Ct. Cl. 1966).............................................................................21

*Nat'l Inst. for Strategic Tech. Acquisition and Commercialization v. Ford Motor Co.*,
   327 Fed. Appx. 890 (Fed. Cir. 2009)...............................................................13

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
   470 U.S. 451 (1985)....................................................................................19, 21

*Northrop Grumman Info. Tech., Inc. v. United States*,
   535 F.3d 1339 (Fed. Cir. 2008).........................................................................16

*Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*,
   373 F.3d 1251 (D.C. Cir. 2004)..........................................................................6

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990).........................................................................................23

*Overall Roofing & Const. Inc. v. United States*,
   929 F.2d 687 (Fed. Cir. 1991)............................................................................3

*Perry v. Martin Marietta Corp.*,
   47 F.3d 1134 (Fed. Cir. 1995)...........................................................................16

*Perry v. New England Bus. Serv., Inc.*,
   347 F.3d 343 (1st Cir. 2003).............................................................................15

*Precision Pine & Timber, Inc. v. United States*,
   596 F.3d 817 (Fed. Cir. 2010)...........................................................................16

*Radium Mines, Inc. v. United States*,
   153 F. Supp. 403 (Ct. Cl. 1957).......................................................................21

*Richardson v. Belcher,*
    404 U.S. 78 (1971) ........................................................................................ 27

*Rick's Mushroom Serv., Inc. v. United States,*
    521 F.3d 1338 (Fed. Cir. 2008) ................................................................ 25, 26

*Roberts v. United States,*
    745 F.3d 1158 (Fed. Cir. 2014) ...................................................................... 2

*Schism v. United States,*
    316 F.3d 1259 (Fed. Cir. 2002) ................................................................ 23, 26

*Sebastian v. United States,*
    185 F.3d 1368 (Fed. Cir. 1999) .................................................................... 15

*Shinnecock Indian Nation v. United States,*
    782 F.3d 1345 (Fed. Cir. 2015) .................................................................... 10

*Silverman v. United States,*
    679 F.2d 865 (Ct. Cl. 1982) ......................................................................... 20

*Smithson v. United States,*
    847 F.2d 791 (Fed. Cir. 1988) ................................................................ 15, 16

*Sperry Corp. v. United States,*
    13 Cl. Ct. 453 (1987) ................................................................................... 20

*Sports Graphics, Inc. v. United States,*
    24 F.3d 1390 (Fed. Cir. 1994) ...................................................................... 15

*St. Christopher Assoc., L.P. v. United States,*
    511 F.3d 1376 (Fed. Cir. 2008) .................................................................... 16

*Stanwyck v. United States,*
    127 Fed. Cl. 308 (2016) ............................................................................... 21

*Thompson v. United States,*
    174 Ct. Cl. 780 (1966) ................................................................................. 20

*Todd v. United States,*
    386 F.3d 1091 (Fed. Cir. 2004) ...................................................................... 3

*Union Pac. R.R. Corp. v. United States,*
    52 Fed. Cl. 730 (2002) ................................................................................. 25

*United States v. King,*
    395 U.S. 1 (1969) ...................................................................................... 2, 3

*Vargas v. United States,*
    114 Fed. Cl. 226 (2014) ............................................................................... 20

*W.E. Partners II, LLC v. United States*,
  119 Fed. Cl. 684 (2015) ........................................................................................ 8

*Wilson v. United States*,
  917 F.2d 529 (Fed. Cir. 1990) .............................................................................. 7

*Y.S.K. Const. Co. v. United States*,
  30 Fed. Cl. 449 (1994) .......................................................................................... 5

## **Statutes**

28 U.S.C. § 1491 ...................................................................................................... 11

31 U.S.C. § 1301 ............................................................................................... 23, 24

31 U.S.C. § 1341 ...................................................................................................... 23

31 U.S.C. § 1501 ........................................................................................................ 8

42 U.S.C. § 18041 ................................................................................................ 5, 16

42 U.S.C. § 18062 ................................................................................... 4, 5, 6, 7, 16

42 U.S.C. § 1395w-115 ............................................................................................. 6

## **Regulations**

42 C.F.R. § 423.336 ................................................................................................... 6

45 C.F.R. § 153.510 ........................................................................................ 5, 15, 19

45 C.F.R. § 153.520 ................................................................................................. 18

45 C.F.R. § 155.1010 ............................................................................................... 20

## **Miscellaneous**

Exchange and Insurance Market Standards for 2015 and Beyond Final Rule,
  79 Fed. Reg. 30,240 (May 27, 2014) ................................................................... 18

The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.)
  2014 WL 4825237 (Sept. 30, 2014) ..................................................................... 24

*To the Adm'r, Veterans Admin.*, B-139880 (Comp. Gen.)
  39 Comp. Gen. 422 (Dec. 4, 1959) ........................................................................ 8

*Principles of Federal Appropriations Law* (GAO Redbook) (Vol. II) (3d ed. 2004) .................... 8

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014) ..................................................... 0

## **Rules**

RCFC 12(b)(6) ..................................................................................... 3, 12, 15, 22

## INTRODUCTION

In early 2014, the Department of Health and Human Services ("HHS") advised qualified health plans, including Highmark, that it would administer the risk corridors program pursuant to a three-year framework under which, if payments fell short of collections in one year's payment cycle, payments in that year would be reduced pro rata to the extent of collections, with further payments made from collections in the later years of the program.[1]  That framework, which HHS reiterated on multiple occasions and has implemented since April 2014, reasonably fills a gap left by Congress when it delegated to HHS the responsibility to "establish and administer a program of risk corridors" without specifying payment deadlines or a source of funding other than risk corridors collections.  In late 2014, Congress enacted the first of its annual appropriation laws that, for all purposes relevant here, cemented HHS's three-year framework by preventing the agency from paying out more than it collects.  Highmark—which twice renewed its participation in the Exchanges notwithstanding its knowledge of this payment framework— now aims to avoid the framework by demanding full payment before its conclusion.  Firmly established legal principles require dismissal of its case.

Highmark seeks to avoid the significance of decades of Supreme Court and Federal Circuit case law by relying upon cases that do not discuss, much less abrogate, the "presently due" requirement.  Moreover, contrary to Highmark's arguments, HHS has clearly stated that final risk corridors payments are not due until the conclusion of the three-year program.  Jurisdictional impediments aside, Highmark's claims are not ripe and Highmark has pled no viable contractual or property right to full annual payments.

---

[1]   As set forth in our Motion, Plaintiffs are collectively referred to as "Highmark," unless otherwise noted.

The narrow issues before the Court are (1) whether, pursuant to section 1342, full annual payments are legally required so as to establish a justiciable and "presently due" claim under section 1342, and (2) whether Highmark has adequately pleaded its claims of contract breach and the Takings clause. For the reasons set forth in the United States' Motion and below, each of these inquiries independently requires dismissal.

## ARGUMENT

### I.  The Court Lacks Jurisdiction and the Claims Are Not Ripe Because Full Payments Are Not Due Annually

#### A.  A Presently Due Claim Is a Prerequisite of Tucker Act Jurisdiction

Highmark first contends, contrary to controlling Supreme Court and Federal Circuit precedent, that a "presently due" claim for money damages is not a prerequisite to jurisdiction under the Tucker Act. The jurisdictional requirement that the money a plaintiff seeks under the Tucker Act be presently due was recognized by the Supreme Court in *United States v. King*, 395 U.S. 1, 3 (1969), and has been repeatedly reaffirmed by the Federal Circuit. *See, e.g.*, *Todd v. United States*, 386 F.3 d 1091, 1095 (Fed. Cir. 2004); *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000). The "presently due" requirement applies to *all* claims for *money* damages, and not just to employee pay or contract claims or only to claims seeking non-monetary relief, as Highmark suggests in its myopic reading of *King*. Pls.' Opp'n at 19.

Arguing otherwise, Highmark relies on a series of cases concerning either the standard for identifying a money-mandating source of law (not at issue here) or disputes regarding a plaintiff's eligibility for payment under a money-mandating authority (also not at issue). *See* Pls.' Opp'n at 17-18 (relying on *Roberts v. United States*, 745 F.3d 1158 (Fed. Cir. 2014).[2]

---

[2]  Because timing of payments was not at issue in *Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006), or *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) (en banc), Highmark has

Highmark fails to cite a single case in which the court exercised jurisdiction where, under the rules and terms of the money-mandating authority at issue, payments were not yet due for *any participant*. Highmark's arguments conflict with a litany of controlling case law. *See, e.g., Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340 (Fed. Cir. 2013); *Todd v. United States*, 386 F.3d 1091 (Fed. Cir. 2004); *Overall Roofing & Const. Inc. v. United States*, 929 F.2d 687 (Fed. Cir. 1991); *Johnson v. United States*, 105 Fed. Cl. 85 (2012); *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173 (2009).[3]

Put simply, none of the cases Highmark cites discuss, much less abrogate, the "presently due" requirement, nor could they do so given controlling Supreme Court precedent. *King*, 395 U.S. at 3. Read properly, each of the cited cases is wholly consistent with the "presently due" requirement. All of them recite the traditional rule that Tucker Act jurisdiction does not lie unless the "source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the *damages* sustained." *See, e.g.*, *Lummi Tribe of Lummi Reservation v. United States*, 99 Fed. Cl. 584, 593 (2011) (emphasis added) (citation omitted).[4] Without a

---

misread them. Highmark also quotes a paragraph from the Federal Circuit's decision in *Kanemoto v. Reno*, 41 F.3d 641, 647 (Fed. Cir. 1994). *Kanemoto* concerned only the question of the proper forum (as between the Court of Federal Claims and the District Court) for a plaintiff challenging an agency determination that she was ineligible for restitution under a federal statute. As with the other cases cited by Highmark, there appears to have been no dispute that if the claimant were eligible for payment as she claimed, the payment was due. In any event, if the Federal Circuit's statement in *Kanemoto* is to be read in the way Highmark contends, the statement is directly contradicted by *King*, *supra*, and the court's more recent pronouncements affirming the "presently due" requirement as an independent element of jurisdiction. *See, e.g.*, *Todd*, 386 F.3d at 1095; *Massie*, 226 F.3d at 1321.

[3]    Even if Highmark's characterization of this Court's jurisdiction were plausible (which it is not), the absence of a presently due money claims would require dismissal pursuant to RCFC 12(b)(6). The issue we have presented to the Court is not what amount may be due, as Highmark mistakenly claims, but whether any amount is due at this time.

[4] *Lummi Tribe* cites the "presently" owing requirement expressly. *Lummi Tribe of Lummi Reservation*, 99 Fed. Cl. at 595 n.10.

breach of a presently owed obligation, there can be no injury and, by definition, no "damages sustained." *See Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.,* 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("The term 'money damages' . . . normally refers to a sum of money used as compensatory relief . . . for a *suffered loss*") (emphasis added).  Thus, the cases on which Highmark relies are in full accord that a plaintiff seeking to invoke the Court's Tucker Act jurisdiction must identify a breach of a presently due obligation.  Highmark must establish that the payments it seeks are presently due.

### B.     Final Risk Corridors Payments Are Not Presently Due

All of Highmark's claims—including its contracts and takings theories—are premised on HHS's statutory and regulatory duty to make risk corridors payments.  But under the statute and implementing regulations, final risk corridors payments for benefit year 2014 are not presently due.  Section 1342 does not set payment deadlines, much less annual ones.  Compl. ¶ 80.  Instead, the timing of payments is a gap Congress expressly authorized HHS to fill by granting it authority to "establish and administer" the risk corridors program.  42 U.S.C. § 18062(a).  As explained in the United States' Motion, at 10-11, HHS exercised that authority by establishing, in April 2014, a three-year framework in which it pays what it can each year based upon the amount of "payments in," with final "payments out" not due until the end of the program.[5]  *See* Compl. ¶ 108 (acknowledging HHS's multi-year payment cycle).  It is undisputed that under this framework, Highmark is not presently entitled to final 2014 benefit year payments because the risk corridors program has not yet ended.

---

[5]  Highmark cites to earlier rulemaking in which HHS specifically declined to propose or adopt payment deadlines but suggested that it would make payments "within a 30-day period after HHS determines that a payment should be made to the QHP issuer."  Compl. ¶ 83. Those statements, which Highmark concedes were neither formally proposed nor adopted, *id.*, have no force of law.

4

### 1.  HHS's Three-Year Framework Is Entitled to Deference

A heightened "standard of deference applies if Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by the agency's generally conferred authority and other statutory circumstances." *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361-62 (Fed. Cir. 2005) (internal quotation omitted).  Congress has authorized agency gap filling in two independent provisions of the ACA that are relevant here.  First, by conferring on HHS the authority to "establish and administer" the risk corridors program, 42 U.S.C. § 18062(a), Congress explicitly authorized HHS to fill any gaps regarding the administration of the program—including the implementation of a collection and payment framework.  *See, e.g.*, *Y.S.K. Const. Co. v. United States*, 30 Fed. Cl. 449, 458 (1994) (delegation of "broad authority to administer the statutory program" necessarily entails "the authority to make any decisions necessary to fill any gaps or ambiguities in that statute").  Second, through Congress's general direction that "[t]he Secretary shall . . . issue regulations setting standards for meeting the requirements under this title" and "take such actions as are necessary to implement such other requirements," Congress granted HHS general rulemaking authority in the enactment of the ACA.  42 U.S.C. § 18041(a), (c).

Highmark concedes that nothing in the text of section 1342 or 45 C.F.R. § 153.510(b) addresses when payment is due.   Compl. ¶ 80 (neither section 1342 nor 45 C.F.R. § 153.510 "impose a deadline for HHS to tender full risk corridor payments to QHPs").   Highmark nevertheless asks the Court to deviate from the well-settled standard of deference applicable to an agency's gap-filling authority to find that payments are due annually.  Pls.' Opp'n at 21.  First, Highmark suggests that Congress has directly spoken to the timing of payments merely

because it provided in section 1342 that the ACA risk corridors program would be "based on" the Medicare Part D risk corridors program. *See* Pls.' Opp'n at 21 (stating the three-year payment framework is belied by "prior legislative history from Medicare Part D, on which § 1342 was expressly modeled").[6]  But Medicare Part D provides only that "[p]ayments under this section shall be based on such a method *as the Secretary determines*."  42 U.S.C. § 1395w-115(d) (emphasis added).  Thus, HHS is no more statutorily required to remit annual payments under Medicare Part D than it is under the ACA.  Moreover, while HHS has exercised its discretion under Medicare Part D to pay risk corridors payments on an annual basis, *see* 42 C.F.R. § 423.336(c), it is not required to adopt an identical approach under section 1342 simply because Congress required the program to be "based on" Part D.  *See Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) ("[t]here is no question that the phrase 'based on' is ambiguous") (citation omitted); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 8 F. Supp. 3d 500, 540 (S.D.N.Y. 2014) (distinguishing between the phrase "based on" and "identical to").  Indeed, HHS could not have structured the ACA risk corridors payments identically to those made under Medicare Part D because, unlike under the Medicare Part D statute, Congress did not enact identical language for making payments.  Whereas Congress enacted funding for Part D payments, Congress did not do so as part of section 1342.  *Compare* 42 U.S.C. §§ 1395w-115(a) (conferring budget authority "in advance of appropriations Acts") & 1395w-116 (authorizing "appropriations to cover Government contributions") (capitalization omitted), *with* 42 U.S.C. § 18062 (omitting any mention of government contributions).  Thus, section 1342's silence as to the timing of payments

---

[6]   While Highmark suggests it is relying on Medicare Part D's legislative history, it provides none, but instead quotes the Medicare Part D statute itself (42 U.S.C. § 1395w-115(e)(3)(A)), which does not require annual payments.

constitutes a gap that HHS was authorized to fill so long as its approach was reasonable. *Wilson v. United States*, 917 F.2d 529, 535-36 (Fed. Cir. 1990) ("when a statute is silent or ambiguous with respect to the specific issue, the administrative agency's interpretation, if reasonable, is to be followed by the court") (internal citation omitted).

Second, Highmark asserts—inexplicably—that HHS's framework is not entitled to deference because it is a "post-hoc litigation position." Pls.' Opp'n at 21. But as explained in the United States' Motion, the three-year framework pre-dates this suit by nearly two years.

Third, Highmark attempts to rely on *King v. Burwell*, 135 S. Ct. 2480 (2015), Pls.' Opp'n at 21, in which the Supreme Court held that deference was not due to the IRS's interpretation of the statute because, "[i]n extraordinary cases, . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* at 2488-89. This is not such an "extraordinary case." Unlike in *King*, Congress's delegation of authority to HHS to "administer" section 1342 is explicit. 42 U.S.C. § 18062(a). Furthermore, while the 3Rs programs serve an important role in achieving the goals of the ACA in its early years, the question here—when payments are due under section 1342—is not "central to th[e] statutory scheme." *Id.* at 2489. In fact, Highmark concedes that the statute is silent on the question of the timing of payments. Perhaps most importantly, whereas the Supreme Court concluded that the IRS "has no expertise in crafting health insurance policy of this sort," *id.*, HHS has precisely this type of technical expertise in administering a risk corridors program that the Supreme Court found lacking in *King*. Accordingly, *Chevron* deference applies.

Finally, Highmark suggests that because HHS has recorded risk corridors payments as fiscal year 2015 obligations for budgeting purposes, the United States admits that it presently owes full payment as calculated under section 1342. Pls.' Opp'n at 1. This is incorrect. To

comply with federal appropriations law, agencies are required by law to charge obligations to the fiscal year in which they are incurred, including indefinite obligations.  *See generally* 31 U.S.C. § 1501; *see also, e.g.*, *To the Adm'r, Veterans Admin.*, 39 Comp. Gen. 422, 424 (Dec. 4, 1959) ("The general rule is that expenditures are properly chargeable to the appropriation for the fiscal year in which the liability was incurred.").  As a result, agencies often record obligations that are not yet due, including certain obligations that may never come due.  Recording says nothing about when, or even whether, payments are legally due.  GAO, *Principles of Federal Appropriations Law* (GAO Redbook) (Vol. II) at 7-8 (3d ed. 2004) ("If a given transaction is not sufficient to constitute a valid obligation, recording it will not make it one.") (citations omitted).

### 2.   HHS's Three-Year Framework Is Reasonable and Therefore Payments Are Not Presently Due

HHS's three-year payment framework is a permissible construction of section 1342 and is entitled to deference because it (1) fills a gap in the statute left by Congress; (2) reflects the agency's considered deliberation, including in notice and comment rulemaking; and (3) is consistent with subsequently enacted laws governing expenditures during fiscal years 2015 and 2016.  *Cf. W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 692 (2015) (giving reasons for deference to an agency's notice and guidance).

In Highmark's view, full, annual payments are due, and the Spending Laws merely transfer responsibility for payment from HHS to this Court.  According to Highmark, the fact that payments and charges are calculated "for" a benefit year means that payments also are due each year.  But "calculation" is not the same as payment.  The three-year framework is a reasonable means for administering the program while the annual payments approach demanded by Highmark would constitute an unauthorized and illegal disregard of Congress's appropriations restrictions.

8

Nor is the three-year framework at odds with the purpose of the risk corridors program. Highmark contends that the "goal of the . . . program is to support [the Exchanges] by providing insurers with additional protection against uncertainty in claims cost during the first three years of the [Exchanges]."  *See* Pls.' Opp'n at 21 (brackets in original).  Whether or not that is true, Highmark offers no reason why the "additional protection" provided by the statute must come in the form of full, annual payments, rather than partial payment spread out over three years.  The same CMS document on which Highmark relies for this proposition emphasizes that because "this is a three-year program, we will not know the total loss or gain for the full three years of the program until the fall of 2017."  Pls.' Opp'n A66.  In any event, Congress has enacted budget limitations that, at present and in light of the shortfall in collections, prevent HHS from making full annual payments and contemplate that payments may be made in any payment cycle across the "three year period risk corridors are in effect."  160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).  Because section 1342 does not require—and, in light of the shortfall in collections, the Spending Laws do not permit—full payment on an annual basis, the Court must defer to HHS's three-year framework.  *See Higashi v. United States*, 225 F.3d 1343, 1347 (Fed. Cir. 2000) ("This court defers to an agency's interpretation of a statute it administers when the statute leaves to the agency 'the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress,' and the agency's interpretation is not arbitrary or capricious and does not contravene clearly discernible legislative intent.") (internal citations omitted).

In sum, HHS's three-year framework is a reasonable and proper implementation of section 1342.  Highmark has been on notice of that framework since the first months of the risk corridors program.  The Spending Laws, for all purposes relevant here, cement that framework.

Because full payment is not due under HHS's administrative framework, Highmark's claims are not "presently due" and the Court must dismiss them for lack of jurisdiction.

### C.       Highmark's Claims Also Are Not Ripe

Ripeness principles prevent courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]" *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations omitted).  Determining whether a dispute is ripe requires evaluation of: (1) the "fitness" of the disputed issues for judicial resolution; and (2) "the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).  The issues here are not fit for judicial resolution.  There has been no breach of a present obligation, additional payments are forthcoming, and the total amount of those payments will be unknown until the program concludes.  Until that time, the claims are necessarily abstract and premature because they cannot properly be resolved without further factual development (as to the amount of payments and collections across all three program years) and further legal development (as to the appropriations available for the final payment cycle of the program).  Because those essential pieces of information would "significantly advance" the Court's ability to deal with the issues presented, the case is not ripe.  *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008).

In an effort to avoid this conclusion, Highmark contends that allowing the claims to ripen through the administrative and political processes will result in hardship.  Pls.' Opp'n at 26.  But, Highmark has been aware of the three-year framework since April 2014.  Requiring Highmark to abide by the terms of an administrative process of which it has had notice for more than two years cannot be a hardship in the legal sense of the word.  Furthermore, abstention by the court will not affect whether Highmark will offer QHPs in 2017; those decisions have already been

made.   And Highmark's contention that abstention will "indefinitely delay[] resolution of [Highmark's] claims," Pls.' Opp'n at 26, is completely unfounded: the risk corridors program is in the final quarter of its final year and HHS intends to operate the final payment and collections cycle in 2017.   Conversely, exercising restraint until the conclusion of the program permits resolution through administrative and political processes to the extent possible and conserves judicial resources should the dispute fail to move from conjectural to concrete.   The case should be dismissed because Highmark's claims are not ripe.

### D.     Highmark's Claim for 2015 Is Improper

Finally, even if the Court were to conclude that Highmark's claim for benefit year 2014 payments falls within its Tucker Act jurisdiction and is ripe, Highmark's claim for 2015 must be dismissed.   It is undisputed that 2015 amounts have not yet been announced by HHS.   Therefore, even under Highmark's theory that payments are "due" once they have been calculated and announced by HHS, 2015 payments are not yet due.

Highmark effectively concedes as much by framing its 2015 claim as one for declaratory relief.[7]   It is well-established, however, that Tucker Act does not empower this Court to issue declaratory relief except in specific statutorily defined circumstances, none of which apply here. 28 U.S.C. § 1491(a)(2), (b)(2).   Furthermore, any declaratory relief issued by the Court must be "incident" and "collateral to" and necessary "to complete the relief afforded by" a money judgment within the Court's primary jurisdiction.   *Id.*   Even if Highmark presented a proper money claim for 2014 (it has not), its claim for 2015 is not "incident" or "collateral to" its 2014 claim; it is an independent claim that must be evaluated on its own facts, if and when it becomes

---

[7]   Although Highmark's Complaint does not seek 2015 risk corridors payment, in its Opposition, it suggests that HHS has anticipatorily breached its payment obligations for 2015.   Pls.' Opp'n at 15, n.33.   This concept has no application to the statutory claims on which the Complaint is based.

ripe.  The Court's narrow power to issue declaratory relief does not permit claimants to circumvent the "presently due" requirement of the Tucker Act or to bypass independent review of differently situated claims.

For all of the reasons set forth above, the Court should dismiss the Complaint for lack of jurisdiction and lack of a justiciable claim.[8]

## II.   Highmark's Contracts and Takings Claims Must Be Dismissed for Failure to State a Claim on Which Relief Can Be Granted

### A.   Highmark Fails to State a Claim on Count II (Breach of Express Contract)

In Count II, Highmark asserts that failure to make annual risk corridors payments constitutes a breach of duties contained in the express "QHP Agreements."  Contrary to its assertions, Highmark cannot withstand dismissal of this claim merely by alleging the existence of any existing contract with HHS; rather, it must identify a breach of *a duty* contained in that contract.  *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014).  Furthermore, because the existence of such a duty is not a factual question, the Court is not required to accept—and it should not accept—Highmark's legal conclusions on this point.  Whether the QHP Agreement encompasses a promise to make risk corridors payments is a legal question of contract interpretation appropriately resolved by the Court pursuant to RCFC 12(b)(6).  *See, e.g.*, *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009); *Nat'l Inst. for Strategic Tech. Acquisition and Commercialization v. Ford Motor Co.*, 327 Fed. Appx. 890, 892 (Fed. Cir. 2009); *Frazier v. United States*, 67 Fed. Cl. 56, 60 (2005).

---

[8]  The United States' position in *Evergreen Health Cooperative, Inc. v. HHS*, No. 1:16-cv-2039 (D. MD), is not contrary, as Highmark asserts.  Pls.' Opp'n at 17 n. 39. *See* Gov't Mem. in Supp. of Mot. to Dismiss at 10 n.8, *Evergreen Health Cooperative, Inc. v. HHS*, No. 1:16-cv-2039 (D. Md. Aug. 15, 2016), ECF No. 41-1 ("The government's motion [to dismiss Health Republic Ins. Co. v. United States] explains that jurisdiction is lacking at this time because the full risk corridors amounts are not 'presently due' and because suits for such amounts are not ripe at this time[.]").

### 1. The QHP Agreements Do Not Encompass Risk Corridors Obligations

As explained in the United States' Motion, at 25-29, the QHP Agreements have nothing to do with the risk corridors program, contain no mention of risk corridors payments, and instead set forth the privacy, security, and electronic transmission duties QHPs that use the Federally-facilitated Exchange platform are bound to. *See generally* Compl. Exhibits 2-17.[9] Unsurprisingly then, Highmark does not even allege that it understood the QHP Agreements to include a contractual obligation to make risk corridors payments. It alleges only that the expectation of receiving risk corridors payments was "material to [its] agreement to enter into" the QHP Agreement. Compl. ¶ 187. Such a pleading fails to allege the existence of an actual contractual commitment and Count II must be dismissed.

In any event, Highmark's two arguments that seek to show that the QHP Agreements incorporate a risk corridors obligation each fail as a matter of law. First, Highmark relies on section II.d, which requires HHS to "undertake all reasonable efforts to implement systems and processes that will support QHP[] functions" and provides that "[i]n the event of major failure of CMS systems and processes, CMS will work with QHP[] in good faith to mitigate any harm caused by such failure." Pls.' Opp'n at 29.[10] According to Highmark, "[s]ection II.d embraces all aspects of the risk corridors program" as the word "process" includes the risk corridors program because "by design, the charge-collection process promotes QHPs' functions by smoothing annual premiums . . . [t]his process fails to support QHP functions, though, when the

---

[9]   Highmark is also incorrect to suggest that the QHP Agreements establish a contractual commitment to offer QHPs. They do not. Rather, the QHP Agreements merely require an issuer that has decided to issue QHPs (and to do so on a Federally-facilitated Exchange platform) to comply with specified electronic transmission standards. *See generally* Compl. Exhibits 2-17.

[10]   Highmark appears to be referring to section II.d of the 2014 Agreement, Compl. Ex. 2. Similar language appears in sections III.a of the 2015 and 2016 Agreements. *See* Compl. Exs. 7 & 12.

Government breaches its corresponding obligation to make risk corridors payments in full and on time" (Pls.' Opp'n at 29, n.64).   This argument has no support in the text of section II.d or any other provision of the Agreement, and it has no limiting principle.   It would extend far beyond the risk corridors program to, for example, the permanent risk adjustment program, the transitional reinsurance program, the consumer subsidy programs, and every other federal program operated by HHS that might conceivably impact a QHP's "functions."   HHS did not, by entering into a nine page QHP Agreement related to privacy and security standards for data transmissions, expansively commit to support QHP operations in every conceivable way.

The Court must read the term "systems and processes" in context.   *See Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999).   As explained in the United States' Motion, at 26-27 & nn.17, 18, the context and surrounding provisions of section II.d demonstrate that the term "systems and processes" refers solely to the electronic systems and processes through which personally identifiable information and other data flows between issuers and the Federally-facilitated Exchanges.   This conclusion follows also from the surrounding provisions in section II, which relate to standards for electronic transactions under HIPAA and other federal law.   Indeed, the "Companion Guide," incorporated by reference in section II.b(3),[11] sets forth the "systems and processes" to which section II.d

---

[11]   Contrary to Highmark's assertion, because section II.b(3) of the QHP Agreements expressly incorporate the Companion Guide by reference and the Complaint incorporates the QHP Agreements by reference, the Companion Guide is part of the QHP Agreement and the Court may consider it on this motion to dismiss.   *See Bell/Heery v. United States*, 106 Fed. Cl. 300, 307-08 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir. 2014) ("All the materials defendant has submitted are either specifically referenced in the complaint or are integral to it.   Because plaintiff does not dispute the authenticity of any of these documents, the court will consider them[.]"); *Perry v. New England Bus. Serv., Inc.*, 347 F.3d 343, 345 n.2 (1st Cir. 2003) ("Where . . . 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).")   The Court

refers, including the: "testing process" (at 3), "validation processes" (at 4-5), "Centers for Medicare and Medicaid Services (CMS) Enterprise File Transfer (EFT) System" (at 7, 33), "Federal Exchange Program System (FEPS) Enrollment Data Store (EDS)" (at 9-10), "enrollment process" (at 27-26), termination process (at 32-35), monthly reconciliation process (at 35), "HHS Reconciliation Process Flow" (at 33), "QHP Issuer Reconciliation Process Flow" (at 32) and the "comparison process" (at 34). *See* Motion Appendix at A53. These systems and processes have nothing to do with the risk corridors program, demonstrating that neither does section II.d. *See, e.g.*, *Sports Graphics, Inc. v. United States,* 24 F.3d 1390, 1392 (Fed. Cir. 1994) ("Under the rule of *ejusdem generis,* which means 'of the same kind,' where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified.").

In the alternative, Highmark asserts that section V.g's governing law provision incorporates section 1342 and 45 C.F.R. § 153.510. Pls.' Opp'n at 30. Like Highmark's "systems and processes" theory, this theory finds no support in the contractual text and it has no limiting principle. It would necessarily transform the entire corpus of federal law into a contractual commitment with HHS, a proposition that the Federal Circuit and this Court have repeatedly rejected. *See, e.g.*, *Earman v. United States*, 114 Fed. Cl. 81, 104 (2013); *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988). Statutory and regulatory provisions are not incorporated into a contract with the government "unless the contract *explicitly* provides for the incorporation." *St. Christopher Assoc., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008); *see, e.g.*, *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir.

---

also may consider the Companion Guide because it is a matter of public record. *Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record.").

2010); *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008); *Smithson*, 847 F.2d at 794.  Because the QHP Agreements do not explicitly provide for incorporation of section 1342, Highmark's section V.g theory must be rejected as a matter of law.  *See Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995) (affirming dismissal of identical theory under RCFC 12(b)(6) because "[t]he interpretation of regulations incorporated into a contract is purely a legal question.").

In short, the provisions of section 1342 are not terms of the QHP Agreements.  And even if this were not plain from the text of the Agreement, it is clear from the broader statutory scheme:  the risk corridors program applies to all QHPs.  42 U.S.C. § 18062(a).  But only a subset of QHPs (those participating on federal Exchange platforms and state Exchanges that connect to the federal platform) enter QHP Agreements with HHS.  *See* Motion at 6, 30.  Thus, to interpret the QHP Agreements to incorporate a risk corridors obligation would create an absurd result as a matter of programmatic design, whereby QHP issuers on federal platforms could enforce their rights in contract while those on state platforms could not.  The Supreme Court has held that a legal interpretation under which the rights of participants on federal and state Exchanges would fundamentally differ should be rejected.  *King*, 135 S. Ct. at 2491 (rejecting textual interpretation under which "State and Federal Exchanges would differ in a fundamental way" because 42 U.S.C. section 18041(c) "indicates that State and Federal Exchanges should be the same").  Thus, the stark asymmetry in rights that would result from accepting Highmark's mistaken theory is not "irrelevant," as Highmark suggests, Pls.' Opp'n at 29, n.66; rather, it demonstrates the error of Highmark's reasoning.

**2.      Even if the QHP Agreement Incorporated Risk Corridors Obligations, Highmark Has Not Identified a Breach or Damages**

Finally, Highmark has not plausibly alleged that HHS breached any contractual obligation.  Even if section II.d related to the risk corridors program (it does not), it would require only that HHS "undertake all reasonable efforts" to implement the risk corridors program in a supportive way, it would not require HHS to do what is legally prohibited by making full payment in contravention of congressional limitations.  Highmark fails to identify any way in which HHS's implementation efforts—given the undisputed budgetary constraints facing the agency—are unreasonable.  In any event, all of Highmark's textual theories simply seek to incorporate the entire risk corridors program into the QHP Agreements as a matter of contract.  Any such incorporation would necessarily include the legal and administrative scheme governing the program, including HHS's three-year payment framework.  *See, e.g.*, Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240 30,260 (May 27, 2014).  Nothing in Highmark's reading of the QHP Agreement requires anything else.  Because any contractual obligation grounded in the QHP Agreements could extend no farther than what is required by statute and regulation, HHS cannot have breached such an Agreement by making pro-rated payments to the extent of collections in conformity with its three-year payment framework.[12]

---

[12]  Further demonstrating the lack of merit in Highmark's contract theories, Highmark suggests that statements in certain *proposed* rules are, in fact, contractual terms.  *See, e.g.*, Pls.' Opp'n at 30, n.67.  At the same time, Highmark contends that HHS's subsequent final rules—including rules describing the three-year framework and the agency's intention to operate the program in a budget neutral manner—somehow breached the alleged contract.  Highmark does not explain why these subsequent final rules would not "govern [the parties'] contractual relationship." Pls.' Opp'n at 30.

**B.      Highmark Fails to State a Claim on Count III (Breach of Implied Contract)**

In Count III, Highmark asserts that HHS's failure to make full annual payments constitutes a breach of an implied-in-fact contract for the payment of risk corridors amounts. This theory is identical to Highmark's express contract theory in regard to the purported terms and scope of the agreement alleged.  *Compare* Compl. ¶ 194 (describing implied contract as an agreement "to make full and timely risk corridor payments . . . in exchange for each Plaintiff Insurer's agreement to become QHPs and participate in the ACA Exchanges for their respective states") *with id.* ¶ 183 (describing express contract as "Plaintiff Insurers' agree[ment] to provide health insurance on particular exchanges, and to accept the obligations, responsibilities and conditions the Government imposed on QHPs" in exchange for risk corridors payments).

As set forth in the United States' Motion, at 29-35, Highmark's allegations do not support a reasonable inference that any implied-in-fact contract obligates HHS to make risk corridors payments.  Highmark concedes that its entire implied-in-fact-contract theory stands on three legs: "§ 1342, 45 C.F.R. § 153.520, and the Government's conduct before and after Plaintiffs agreed to become QHPs for CY 2014."  Pls.' Opp'n at 32; *see also* 36-37 (summarizing factual basis of claim as "the text of §1342 and implementation of its related regulations, plus Government's subsequent statements which incentivized [Highmark] to participate in the ACA Marketplace").  As a matter of law, these bases do not state a claim for breach of an implied-in-fact contract.

**1.      Highmark Has Failed to Allege Facts that Demonstrate an Intent to Contract**

As to Highmark's reliance on section 1342 and 45 C.F.R. § 153.510, "'the United States cannot be contractually bound merely by invoking the cited statute and regulation.'"  *Baker v. United States*, 50 Fed. Cl. 483, 489 (2001) (citation omitted).  "[A]bsent some clear indication

that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (internal quotations, citations omitted). Highmark cannot overcome this presumption unless the language in the statute or regulation or "the circumstances surrounding the statute's passage manifest[] any intent by Congress to bind itself contractually." *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 631 (Fed. Cir. 2012) (citing *Nat'l R.R. Passenger Corp.*, 470 U.S. at 468-70).

Highmark cannot overcome the presumption. Nothing in the text of either section 1342 or 45 C.F.R. § 153.510 indicates an intent to contract. Nor does anything in the legislative history of the ACA suggest that the risk corridors program is contractual. Absent the necessary support to sufficiently allege an intent to contract, Highmark relies on dicta from *ARRA Energy Co. I. v. United States*, 97 Fed. Cl. 12, 27 (2011), to suggest that government conduct alone can demonstrate intent to form an implied-in-fact contract. Pls.' Opp'n at 33. But the "conduct" mentioned in *ARRA* was "the conduct of Congress and the President in enacting and signing the [statute]." *Id.* at 27. In other words, the court in *ARRA* recognized that when, as here, a plaintiff seeks to ground intent to enter an implied-in-fact contract in a statute or regulation, the only relevant "conduct" is conduct "surrounding the statute's passage." *Brooks*, 702 F.3d at 631.[13]

Even if conduct apart from the circumstances surrounding enactment were sufficient to manifest contractual intent, Highmark has not alleged any such conduct. The only conduct it

---

[13]   None of the cases Highmark relies upon concerned the showing necessary to overcome the presumption against a statue being construed as a contractual undertaking. *See Vargas v. United States*, 114 Fed. Cl. 226 (2014), *Frymire v. United States*, 51 Fed. Cl. 450 (2002), *Kanag'iq Constr. Co. v. United States*, 51 Fed. Cl. 38 (2001), *Sperry Corp. v. United States*, 13 Cl. Ct. 453 (1987), *Silverman v. United States*, 679 F.2d 865 (Ct. Cl. 1982), and *Thompson v. United States*, 174 Ct. Cl. 780 (1966).

identifies are HHS's statements in rulemaking and guidance that merely recognize or describe HHS's understanding of its statutory obligations.  *See, e.g.*, Compl. ¶¶ 65, 72, 81-83, 91-96, 98-99.  None of these statements contain any language of offer, acceptance, or contractual intent.  Raising arguments not alleged in its Complaint and incorrectly labeling HHS's QHP certification process as "discretionary," Highmark now contends that intent to contract is evident from HHS's "conduct" of certifying Highmark as a QHP.  Pls.' Opp'n at 33, 34, n.75.  But Highmark identifies nothing at all in the certification process from which the Court can reasonably infer an intent to contract.  Certification is ministerial in that, if an issuer satisfies the requirements, HHS certifies the issuer as a QHP.  *See* 45 C.F.R. § 155.1010.[14]  Nor does HHS's collection of risk corridors charges from one of the plaintiffs or its pro-rata payments to other plaintiffs provide any support to Highmark's theory.  Pls.' Opp'n at 33-34.  HHS's statements recognizing its pre-existing, independent obligation to follow the statute and regulations, and actions taken in accordance with that obligation, are legally insufficient under this Court's precedent to constitute an intent to contract.  *AAA Pharmacy, Inc. v. United States*, 108 Fed. Cl. 321, 328 (2012).[15]

Finally, to the extent Highmark urges the Court to read *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405 (Ct. Cl. 1957) or *New York Airways, Inc. v. United States*, 369 F.2d 743, 751 (Ct. Cl. 1966), as suggesting that the Court can find an implied-in-fact contract merely

---

[14]    *See also*   https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-marketplaces/qhp.html (describing the QHP application process).

[15]   Likewise, nothing in section 1342, HHS's regulations and rulemaking, or its other guidance contain any language that can plausibly be construed as an offer.  That Highmark relied "upon these statements . . . in the Federal Register" in its decision to become a QHP, Compl. ¶ 85; *see also* Pls.' Opp'n at 37, is irrelevant because reliance is not an element of an implied-in-fact contract, as explained in the United States' Motion, at 35-36.  Furthermore, HHS's statements in the context of proposed rulemaking cannot constitute an unambiguous offer because those statements, by their nature, are subject to change.  Contrary to Highmark's contention, Pls.' Opp'n at 37, n.81, Highmark became certified as a QHP before HHS announced final rules for risk corridors payments, demonstrating that neither party considered the risk corridors program to be a contractual, as opposed to a statutory, obligation.

from the terms and conditions of a statutory program designed to fulfill the government's policy objectives, that reading cannot be reconciled with more recent Supreme Court and Federal Circuit precedent holding that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'"  *Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66; *see Brooks*, 702 F.3d at 631; *see also Stanwyck v. United States*, 127 Fed. Cl. 308, 313 (2016) ("Absent an adequate expression of actual intent, a court 'will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the state is a party.'") (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 466-67).  Moreover, unlike in *Radium Mines*, where the United States was purchasing uranium ore or in *New York Airways*, where the United States contracted for delivery of U.S. mail, here, the United States is not procuring goods or services, but is administering a program.

> ## 2. HHS Lacked Authority to Bind the United States in Contract for the Payment of Risk Corridors Amounts

> ### a. The Complaint Fails to Plausibly Allege Contracting Authority

The Complaint's sole allegation purporting to establish authority to contract is the following:  "Each of the implied-in-fact contracts were authorized by representatives of the Government who had actual authority to bind the United States."  Compl. ¶ 201.  This assertion—without identifying which representatives authorized the so-called contracts and from where they derived their authority—represents the quintessential "label[]" or legal "conclusion" insufficient to withstand a motion to dismiss under RCFC 12(b)(6).  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).[16]   Even if Highmark seeks to rely on implied authority as it now contends in opposing the Motion to Dismiss, it still must allege facts plausibly alleging that the government representatives with whom it entered the so-called agreement had implied authority to contract for risk corridors payments.   Nothing in the Complaint does so.   Rather, Highmark merely falls back time and again on HHS's statements in the Federal Register, which do nothing more than express HHS's recognition of its statutory obligations.   Nothing in these statements contains language suggesting authority to bind the United States in contract.   *See* Pls.' Opp'n at 39.

Highmark's other new theory, that CMS's CEO of the ACA Marketplaces "ratified" the implied-in-fact contracts, *id.* at 40, suffers from the same flaw.   The letters on which Highmark relies simply reiterate HHS's three-year payment framework and contain no language indicating ratification of any contract for risk corridors payments.   Compl. Ex. 29, 30.   Indeed, Highmark's argument assumes the conclusion:   authority to bind HHS contractually to make risk corridors payments is not integral to Mr. Counihan's duties because the risk corridors program is not administered through contract but through statute and regulation.   It is well settled that a government official's statements cannot create a binding contractual obligation on the part of the United States absent a demonstration that the official is acting pursuant to authority to obligate funds in contract on behalf of the United States.   *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

---

[16] Highmark suggests that its allegations at paragraphs 88-93 and 195 of the Complaint plausibly suggest authority to contract.   Pls.' Opp'n at 39.   But because these allegations are only HHS's acknowledgments of the statutory and regulatory scheme, they provide no factual basis from which to infer *contracting* authority.

**b.      The Complaint Fails to Plausibly Allege Budget Authority**

In addition to failing to allege a plausible factual basis for contracting authority, Highmark's claim fails as a matter of law because HHS did not have budget authority to contract for risk corridors payments.  *See, e.g.*, *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 643 (2005) (recognizing that "without . . . special authority, a[n] . . . officer cannot bind the Government in the absence of an appropriation") (citations omitted).  The Anti-Deficiency Act prohibits government officials from involving the "government in a[n] . . . obligation for the payment of money before an appropriation is made unless authorized by law[.]"  31 U.S.C. § 1341(a)(1)(B); *see also id.* § 1301(d) ("A law may be construed . . . to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states . . . that such a contract may be made.").  The Act also "restricts the ability of the government to enter into multi-year contracts [absent special authority] because funds generally cannot be obligated beyond the current fiscal year."  *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1449 (Fed. Cir. 1997); *see also Schism v. United States*, 316 F.3d 1259, 1300 (Fed. Cir. 2002). Thus, without either specific authority to bind the government in contract in advance of an appropriation or valid multi-year authority that could be used for contractual obligations, HHS could not form a contract in September 2013 (fiscal year 2013) for the payment of risk corridors amounts in December 2015 (fiscal year 2016).

As a basis for such authority here, Highmark contends that the GAO determined "in September 2014 that the HHS Secretary had actual authority to make risk corridor payments." Pls.' Opp'n at 39.[17]  That is not what the GAO determined.  Rather, the GAO concluded that

---

[17]  To the extent Highmark is arguing that HHS enjoyed *implied* budget authority (Pls.' Opp'n at 39), it is incorrect as a matter of law.  *See* 31 U.S.C. § 1301(d) ("A law may be construed . . . to authorize making a contract for the payment of money in excess of an appropriation only if the

"any amounts collected in FY 2014 pursuant to section 1342(b)(2) *would have been* available, along with the general CMS [Program Management] lump-sum appropriation" for risk corridors payments as "other responsibilities" of CMS.  The Honorable Jeff Sessions, the Honorable Fred Upton, B-325630 (Comp. Gen.), 2014 WL 4825237, at *5 (Sept. 30, 2014) (emphasis added). But the GAO went on to observe that, because risk corridors payments were not due in fiscal year 2014, and because "[a]ppropriations acts, by their nature, are considered nonpermanent legislation . . . [l]anguage appropriating funds for 'other responsibilities of [CMS]' [and language appropriating sums for authorized user fees] *would need to be included in the CMS PM appropriation for FY 2015* in order for it to be available for [risk corridors] payments . . . ."  *Id.* (emphasis added).  Thus, because risk corridors payments were not due in fiscal year 2014, they did not constitute "other responsibilities" of HHS in that fiscal year such that the 2014 Program Management appropriation could supply an appropriation for risk corridors payments.

Nor could the fiscal year 2014 appropriation provide the multi-year authority necessary to sustain the contract theory Highmark asserts here because, as the GAO concluded (and as is evident from the text of the appropriation), the $3.6 billion lump sum amount expired as of the conclusion of fiscal year 2014, and the amount of any authorized user fees for risk corridor payments would not be determined and collected until after the end of fiscal year 2014.  An implied-in-fact contract for payment in future years cannot be formed where the requisite authority to bind the United States government does not extend beyond the fiscal year in which the alleged contract was entered into.  *See Cessna Aircraft, Co.*, 126 F.3d at 1449.

---

law *specifically states* . . . that such contract may be made") and 31 U.S.C. § 1301(c) ("An appropriation in a regular, annual appropriation law may be construed to be . . . available continuously only if the appropriation . . . *expressly provides* that it is available after the fiscal year covered by the law in which it appears") (all emphasis added).

Finally, because risk corridors payments are based on issuers' losses and those losses cannot be determined in advance of the benefit year, under Highmark's theory, any contract to make risk corridors payments would be an open-ended indemnification agreement.  Courts have relied on the Anti-Deficiency Act in refusing to find implied indemnification agreements and in rejecting express indemnification agreements.  *See, e.g.*, *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed. Cir. 2008); *Union Pac. R.R. Corp. v. United States*, 52 Fed. Cl. 730, 732-34 (2002); *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 22-25 (1987).

In sum, Highmark fails to identify the requisite budget authority that would permit HHS or any of its officials to enter an implied contract to make risk corridors payments in excess of collections.

### 3.      An Implied Contract Cannot Be Grounded on an Express Contract

Finally, the existence of the express QHP Agreements precludes Highmark's theory that HHS entered into an implied-in-fact contract for risk corridors payments in exchange for its decision to participate on the Exchanges as a QHP.  Highmark is incorrect to contend that this well-established principle does not apply simply because its express and implied contract theories are asserted in the alternative.  Pls.' Opp'n at 38.   While Highmark is allowed to plead in the alternative, it cannot base an implied contract on subject matter that is already the subject of the express QHP Agreements.  *See, e.g.*, *Rick's Mushroom Svc.*, 521 F.3d at 1344; *see also Schism*, 316 F.3d at 1278.  Here, the alleged consideration for both the express QHP Agreement and the implied-in-fact agreement is Highmark's decision to become a QHP.  Highmark alleges it "agree[d] to become [a] QHP," Compl. ¶¶ 196, 197, and that the "parties agreement is further confirmed by . . . the execution by the Parties of the CY 2014 QHP Agreements," *id.* at 200.

Thus, the existence of an express contract governing that decision precludes the existence of a separate implied contract incorporating risk corridors payments as an additional obligation. Highmark's decision to be a QHP on Exchanges that connect to the federally-facilitated platform cannot be subject to the QHP Agreement and *also* constitute consideration for a separate and independent implied-in-fact agreement for the United States to make risk corridors payments. Count III must be dismissed.[18]

### C.    Highmark Fails to State a Claim on Count V (Takings)

Highmark also has not plausibly alleged a vested property interest in risk corridors payments as it must to plead a takings claim under the Fifth Amendment. *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). As Highmark appears to concede, Pls.' Opp'n at 47, an ordinary obligation on the part of the United States to pay money under a statutory benefits program does not give rise to a Fifth Amendment property interest. *See, e.g.*, *Adams v. United States*, 391 F.3d 1212, 1225 (Fed Cir. 2004); *Avenal v. United States*, 33 Fed. Cl. 778, 788 (1995) ("It is well established that recipients of benefits under government entitlement programs do not possess a substantive property right in the continuation of those benefits for purposes of the Fifth Amendment.") (citing *Bowen v. Gilliard,* 483 U.S. 587, 604-05 (1987); *Richardson v. Belcher,* 404 U.S. 78, 80-81 (1971)). Hence, and as Highmark acknowledges (Pls.' Opp'n at 47), its takings claim hinges entirely on the existence of a contract to make risk corridors payment. But none exists. It is axiomatic that Highmark "cannot claim a taking of that which [it] never had." *Brooks v. Dunlop Mfg. Inc.*, No. C 10-04341 CRB, 2011 WL 6140912, at *6 (N.D. Cal. Dec. 9, 2011), *aff'd*, 702 F.3d 624 (Fed. Cir. 2012). Highmark's

---

[18]    Because Highmark cannot plausibly plead the existence of a contract with respect to risk corridors, its claim for breach of an asserted duty of good faith and fair dealing fails as a matter of law. *HSH Nordbank AG v. United States*, 121 Fed. Cl. 332, 341 (2015). Count IV must be dismissed.

failure to establish a cognizable property interest forecloses any takings claim.  *Am. Pelagic Fishing Co.*, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts task is at an end.").  Count V should be dismissed.

## CONCLUSION

Highmark's Complaint should be dismissed for lack of jurisdiction or in the alternative because Highmark fails to present a justiciable claim or claims on which relief can be granted.

Dated: November 2, 2016                       Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

/s/ *Charles E. Canter*
CHARLES E. CANTER
FRANCES M. MCLAUGHLIN
SERENA M. ORLOFF
TERRANCE A. MEBANE
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch
Telephone: (202) 616-2236
Facsimile: (202) 307-0494
Charles.Canter@usdoj.gov

*Attorneys for the United States of America*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of November 2016, a copy of the foregoing, *The United States' Reply in Support of its Motion to Dismiss*, was filed electronically with the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing will be sent to all parties by operation of the Court's ECF system.

/s/ *Charles E. Canter*
CHARLES E. CANTER
United States Department of Justice