IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRST PRIORITY LIFE INSURANCE COMPANY, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 16-587C |
| | ) | Judge Wolski |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

### THE UNITED STATES' RESPONSE TO THE BRIEF OF *AMICUS CURIAE* PENNSYLVANIA INSURANCE DEPARTMENT IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS

Defendant, the United States of America ("United States"), respectfully responds to the Brief of *Amicus Curiae* Pennsylvania Insurance Department in Opposition to the United States' Motion to Dismiss ("Amicus Brief") [docket no. 11-2] as follows.

On May 17, 2016, Plaintiff First Priority Life Insurance Company and five Highmark affiliates (collectively, "Highmark") filed this action seeking over $222 million in money damages in reliance upon section 1342 of the Patient Protection and Affordable Care Act ("ACA") and related contracts and takings theories. *See* Complaint [docket no. 1]. On September 16, 2016, the United States filed its Motion to Dismiss [docket no. 8], seeking dismissal of the case on jurisdictional and ripeness grounds for lack of a presently due money damages claim and further seeking dismissal of Highmark's contracts and takings claims for failure to state a claim upon which relief can be granted.

As set forth in the United States' Motion to Dismiss, the narrow issues currently before the Court are:

- Whether, as required by 28 U.S.C. § 1491, Highmark has an entitlement to "presently due money damages" under a government benefits program that does not require final payment before the end of the final payment cycle in 2017;

- Whether Highmark's claims for full payment are ripe for review before a final agency determination by the Department of Health and Human Services ("HHS") of how much will be paid out at the conclusion of the three-year risk corridors program; and

- Whether Highmark has adequately alleged contracts and takings claims where the express contract on which they rely has nothing to do with risk corridors, and where the implied-in-fact contract and takings claims rest wholly on statutory and regulatory rights.

*See* Motion to Dismiss at 2-3. Nothing in the Amicus Brief bears on these issues. Indeed, the Amicus Brief does not discuss jurisdiction at all, nor does it discuss any aspect of the United States' explanation for why Highmark is not entitled to additional risk corridors payments.

Specifically, the Amicus Brief does not address whether HHS's implementation of a three-year payment framework reasonably fills a gap left in the statute. *See* Motion to Dismiss at 10-11, 17-19. In fact, *Amicus's* suggestion that "full payment would be made" in 2015, Amicus Br. at 5 n.6, ignores the three-year framework established by HHS in April of 2014, which expressly contemplates a pro-rata reduction in payments and payments across multiple years where, as here, there is a shortfall in collections. Nor does the Amicus Brief address any of the reasons why the three-year framework is entitled to deference, such as the omission of a specific appropriation for risk corridors payments, the omission of the risk corridors program in the Congressional Budget Office's scoring of the ACA, or the Spending Laws and their legislative history, which recognized and blessed the three-year framework. *See* Motion to Dismiss at 9-10, 19-21. Instead, the Amicus Brief merely presents *Amicus's* view that full payments would be good for insurance markets in Pennsylvania, an opinion that has no relevance to the questions before the Court.

2

Regarding Highmark's contracts and takings claims, the Amicus Brief mentions only the QHP Agreements, asserting that issuers signed QHP Agreements "with the assumption" that full risk corridors payments would be made.  Amicus Br. at 5-6.  The assertion that issuers assumed they would receive full annual payments is fundamentally at odds with the undisputed chronology of events in this case. At all times, issuers knew that Congress did not specifically appropriate funds or authorize appropriations for risk corridors payments and that neither section 1342 nor HHS's regulations set a deadline for risk corridors payments.  Moreover, in April 2014, four months into the first benefit year and well before issuers decided to continue offering QHPs in the second and third years of the program, HHS announced its three-year framework and the industry itself projected a significant shortfall in collections.[1]

In any event, *Amicus* erroneously states that "[o]nce a QHP Agreement was signed, an insurer could not withdraw any of its plans from the Exchange and had to accept coverage for all eligible applicants."  Amicus Br. at 5.  To the contrary, as explained in the United States' Motion to Dismiss, at 24-29, the QHP Agreements merely govern the manner of an issuer's participation in the Exchanges, in particular, the issuer's transmission of data with the Exchanges and the protection of personally identifiable information in those transmissions.  *See* Compl. Ex. 2 (QHP Agreement) § II [docket no. 1-1].  The QHP Agreements do not contractually obligate an issuer to offer plans on an Exchange, *see id.* § IV.c, and nothing in the QHP Agreements commits HHS to make risk corridors payments.  *See generally id.* §§ I-V.  Finally, the Amicus Brief neglects to mention that the Pennsylvania-based Highmark plaintiffs only signed QHP Agreements because Pennsylvania does not operate its own, State-based Exchange.  As noted in the Motion to Dismiss, at pages 5-6 and 24-25, many QHP issuers never sign QHP Agreements with HHS.  However,

---

[1]  *Amicus* provides no support for its allegation of a "credible promise of complete Risk Corridors payments."

because section 1342 creates a statutory program, not a contractual obligation, those issuers are statutorily obligated to participate in the risk corridors program regardless of whether they signed any QHP Agreements with HHS.  Thus, construing the QHP Agreements to incorporate a contractual obligation relating to risk corridors payments would create an artificial policy distinction by which certain risk corridors participants obtained contractual rights and others did not, based solely on the individual decisions of the states in which they elect to sell insurance. *Amicus* fails entirely to address this point.

*Amicus's* contention that risk corridors payments affect competition, insurer solvency, and market stability, Amicus Br. at 9-14, amounts to little more than a contention that issuers would be better off with larger federal subsidies than they have received to date.  As set forth above, this contention is not relevant to the questions before the Court, which fundamentally turn, not on what issuers would prefer, but on what Congress has required.  In any event, Congress provided only for a transitional, three-year risk corridors program, and that program is coming to an end with the close of the 2016 benefit year.  Issuers, including Highmark, have already committed to participate on the Exchanges for 2017—charging premiums approved by *Amicus*—with no expectation of risk corridors payments for that year or any future year, and with knowledge of the three-year framework and Congress's appropriations restrictions on risk corridors payments.  In other words, *Amicus's* contention that "additional carriers may withdraw from the Exchange due to unanticipated losses" without additional risk corridors payments for 2014, Amicus Br. at 10, is belied by the business decisions of Highmark itself.  In short, competition in Pennsylvania does not require additional risk corridors payments; *Amicus* identifies no issuers in Pennsylvania whose solvency depends on additional risk corridors payments for 2014; and *Amicus* has already approved premiums for 2017, so *Amicus* has not demonstrated that additional risk corridors

4

payments for past years affect market stability in Pennsylvania.  Indeed, as *Amicus* admits, issuers who participated on the Exchanges in 2016 did so "without any assurance of how much money they would receive."  Amicus Br. at 6.  Accordingly, *Amicus's* contentions are not only irrelevant, they also lack merit on their own terms.

## CONCLUSION

The contentions of *Amicus* have no bearing on the Court's consideration of the issues presented in the United States' Motion to Dismiss.  For the reasons set forth in the United States' Motion to Dismiss and the United States' Reply in Support of Its Motion to Dismiss [docket no. 17], the Complaint should be dismissed.

Respectfully submitted,

Dated:  November 17, 2016            BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

 */s/ Charles E. Canter*
CHARLES E. CANTER
TERRANCE A. MEBANE
SERENA M. ORLOFF
L. MISHA PREHEIM
PHILLIP M. SELIGMAN
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
Phone (202) 616-2236
Fax (202) 307-0494
Charles.Canter@usdoj.gov

*Attorneys for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 17, 2016, a copy of the attached Response to the Brief of *Amicus Curiae* Pennsylvania Insurance Department was served via the Court's CM/ECF system on counsel of record in this case.

<u>*/s/ Charles Canter*</u>
Charles E. Canter
U.S. Department of Justice